**GURYAN et al. v. KANDELL.**

No. 24.

Circuit Court of Appeals, Second Circuit.

Nov. 24, 1941.

Harold A. Lipton and Booth, Lipton & Lipton, all of New York City, for the trustee.

Joseph G. Blum, Blum & Jolles, and Martin Goodman, all of New York City (Joseph H. Stein, of New York City, of counsel), for the Foreign Legatees.

Lillian Poses, of New York City, for Seymour and Beverly Guryan.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us, principally upon the appeal of the trustee in bankruptcy from an order of the district court, affirming with some modifications the order of a referee allowing certain claims against the estate. Two of the claimants, Seymour and Beverly Guryan, also appeal because part of their claims was denied. The bankrupt was a company engaged in the haberdashery business; all its shares had been owned by one, Isaac Guryan, who died in 1927; the claimants are his children, Seymour and Beverly, and certain Polish and Russian relatives of his to whom he bequeathed legacies. The children's claims are of three kinds: (1) a loan of $6,000 made to the bankrupt in 1937 to enable it to come to a settlement with its landlord; (2) claims for salary as officers of the bankrupt; (3) a loan made by Seymour Guryan to the bankrupt. The claims of the foreign legatees arose out of a contract between them, the children, and the bankrupt on February 15, 1938, which was later ratified by a decree of the Surrogate of New York County, passing the accounts of the executors of Isaac Guryan. Finally, the trustee challenged the validity of two payments, one made to each of the children shortly before petition filed, on the theory that they were voidable preferences. We shall first consider the claims of the foreign legatees.

Guryan's will directed his executors to continue any businesses in which his estate should be invested, and out of the profits to support his son, Seymour, till he reached 21; and to continue thereafter to support him until they turned over to him one-half of the residue of the estate which they were to do as soon as they thought him able "to look after his own affairs"; but in any case not later than his thirtieth birthday. He made a similar provision for his daughter, Beverly, except that the age in her case was 25. To the foreign legatees he bequeathed annuities while the trusts in favor of his children continued in existence, and capital sums when they were wound up. The executors periodically paid to Seymour and Beverly Guryan the sums necessary for their support out of the business of the company, and charged them upon the books as loans to the Guryan estate. So much of such indebtedness as had accrued up to 1931 was cancelled by the declaration of a dividend of $20,000; but later advances—which at petition filed amounted to about $21,000—continued to be charged against the estate as loans, and no dividend was ever declared to offset them. By the year 1937 the company had allowed the rent upon leased premises which it occupied to fall into arrears of more than $14,000, and the landlord threatened eviction. Thereupon an agreement was made under which Seymour and Beverly Guryan were to lend the company $6,000 with which to pay the landlord, and the landlord was to renew the lease. This was done, and about seven or eight months later, i. e. on February 15, 1938, the "Settlement" was made between the company, the foreign legatees and Seymour and Beverly Guryan, which is the basis of the legatees' claim. In the first article of this the company "acknowledged" that it was "indebted" to the legatees in the sum of $6,000 which was to "have priority over the indebtedness" to Seymour and Beverly "arising out of their loan". This priority was "not to affect the status of Seymour and Beverly * * * as general creditors," but they were to receive no payments "until the foreign legatees have received in full their $6,000." Finally, "in the event of a liquidation" Seymour and Beverly agreed "that whatever distributive share may be payable to them as general creditors * * * shall be applied to the balance of the indebtedness due to the foreign legatees." So far the contract gave no remedy for the collection of the "indebtedness;" and none is to be found anywhere in it except in the second article. That declared "that the said sum of Six Thousand ($6000) Dollars shall be payable without interest as follows: Until the said sum of $6,000 is paid in full the Russian and Polish Legatees shall receive a total of 33⅓% of the annual net operating profits", in determining which

Seymour and Beverly Guryan were each to be allowed an officer's salary "of not more than Fifty ($50) Dollars per week". They in turn agreed not to sell any of the shares in the company until the foreign legatees were paid in full, which should "terminate" the agreement.

In the following June the Surrogate passed the accounts of the Guryan executors by a decree which contained two articles dealing with the foreign legatees, each in the same words, except for the amounts. The first of these reads as follows: "that the sum of $1,800 be paid to the Consul General of Poland * * * out of one-third of the profits that may be earned in the operation" of the company "in accordance with the provisions" of the agreement of February 15, 1938. The recitals of the decree declared that Guryan's estate was not enough to pay the "principal sums" to the legatees whose legacies were "accordingly deemed to have lapsed"; therefore "in accordance with the provisions of the compromise agreement the claims * * * are compromised for the sum of $7,500, of which sum $1,500 shall be paid personally by the Executors and the balance of $6,000 shall be paid out of future earnings" of the bankrupt "to the extent of one-third of the annual earnings." The referee and the district judge held that the "Settlement" and decree allowed the foreign legatees to prove for $12,000 (less some small credits) and Seymour and Beverly Guryan also to prove for $6,000 more. The result of this was to create claims of $18,000 against the bankrupt, for which it had never received anything but $6,000.

■■■ The order was plainly wrong insofar as it allowed the foreign legatees to double their claim; the most they could assert on any theory was the right to prove for $6,000 in their own right, and the right to any dividends which Seymour and Beverly Guryan might receive upon their claim for $6,000. Since the "Settlement" explicitly gave the foreign legatees a prior right to those dividends, the controversy comes down to their right to prove on their own account, which they can base only upon the fact that the company acknowledged itself to be "indebted" to them. They had had no pre-existing claim against the company, and a debt cannot be created by "acknowledging" it or "agreeing" to pay it; but they did have power as legatees under Guryan's will to compel the sale of the company's shares, and that would probably have wound up the business. If the company would have been solvent after the addition of $6,000 in favor of the foreign legatees to its existing indebtedness—which on this record it was not—a valid contract could indeed have been drawn by which it assumed the payment of $6,000; for the legatees' forbearance to proceed against the shares would have been a valid consideration for such an assumption, even though the company's creditors received no benefit as they did not. The continuation of the business was no benefit to them, if the company was solvent already; and, even though solvent after the gratuitous addition of $6,000 to its debts, that addition put it in the gravest peril, for its collectible assets—at least three and a half months later—were only about $32,000 and its debts were more than $26,000, not including the supposititious claim of the foreign legatees, or indeed the claim of the children. So to weight it would have been utterly to disregard the interests of its creditors, and we should avoid so interpreting the contract if we can. An analysis of its provisions makes possible such an avoidance.

■■■ The first article in effect declared nothing more than that the claim of Seymour and Beverly should be security for the indebtedness acknowledged. This it did by creating a "priority" in favor of the legatees over the children's claim, by stopping any payment on that claim until they were paid, and, "in the event of a liquidation," impounding any dividends for the benefit of the legatees. Apparently the theory which the referee and the judge accepted, was that because this article declared that the priority should not affect the children's standing as "general creditors," they and the legatees might file separate claims. That was not at all the purpose of that stipulation; on the contrary it was added only to make sure that the rights given to the legatees should not affect the rights of the claimants beyond what was necessary for the legatees' security. Any payment to the legatees for example would not be a payment on the claim. As we have already said, it was the second article which alone gave any remedy to the legatees against the company; having undertaken thus to specify a remedy, that provision must be considered exclusive. This conclusion is particularly apt if one looks at the relative rights of

the parties. While the foreign legatees had, as we have said, no claim of any sort upon the company, Seymour and Beverly were both shareholders and creditors. By giving up to the legatees a part of their rights in both capacities they could save their interest in the shares, without disturbing the interests of the company's creditors. And indeed, if the contract meant to give the legatees more than this, we could not sustain it, so strongly does the record indicate that it would have made the company insolvent. We should at least have to reverse the order and send the cause back for trial on that issue. That is not necessary, however, for we hold that the foreign legatees' rights are limited to the dividends payable upon the children's claim. Their own claim must therefore be expunged. We cannot see that the Surrogate's decree adds much light; but, so far as it goes, it helps our conclusion, for the only payment it directed was out of profits.

▆▆ The trustee next insists that the claim of Seymour and Beverly Guryan should be reduced from $6,000 to $5,000, on the ground that the bankrupt's books show that they advanced only that amount. We cannot agree. The arrangement with the landlord was completed a good deal before the "Settlement" was made; it was in the spring of 1937, and the first payment under it was apparently on July 31, 1937. Seymour and Beverly paid the company and the company paid the landlord; hence no inference is to be drawn from the fact that during 1937 four cheques of the company amounting to $1,000 were applied upon the rent. There was moreover positive evidence that Seymour and Beverly did in fact lend $6,000; the "Settlement" so recites, and Lewis, the executors' attorney, swore explicitly that that amount had been drawn out of their savings bank accounts. Nor can we agree that the trustee can set off the claim against the debt of the Guryan estate to the bankrupt, as he wishes to do. It is true that the books were written up in that way, and, if the cross items had been in fact mutual, the trustee would be right. But there is no reason on this record for saying that Seymour and Beverly Guryan were personally liable for advances made by the company to the Guryan executors even though they were passed over to them. Nor is there any reason—except the books—for saying that the payment of $6,000 was made by the executors; as we have just seen, the only testimony is that it

was not. The claim will be allowed at $6,000.

▆ The referee disallowed a claim of Seymour Guryan for salary during his honeymoon, and the judge affirmed the ruling; but as Seymour's notice of appeal did not challenge this part of the order, we pass the point. In addition Guryan claimed $232.65 as balance of salary between May 31, 1937 and May 31, 1938, at the rate of $50 a week. The company's "unemployment insurance cards" show him first as an employee on January 1, 1938; but he swore that he had been voted a salary of $50 earlier, and that he had not withdrawn all of it because the company was in straits. The referee believed this testimony, but the judge did not, and we agree with the judge. It is not likely that so small a sum should have been considered any real relief to the company, or that it would have exposed itself to the penalties attached to a failure to make correct unemployment returns. If it had shown a disposition completely to disregard the law, that might be more plausible, but not in view of its admittedly partial compliance. Beverly Guryan claimed $600.56 back salary for the same period; and her case is even weaker, for, not only does her name first appear as an employee in July, 1938, but all monies paid her until May 31, 1938 were charged against the Guryan estate. Seymour Guryan also claimed for a supposed loan of $300 made in February, 1938. No such transaction appears upon the books; and although he swore that he had drawn the money from a bank, he failed to produce any confirmatory documents. It is unlikely that the books should contain no entry of this loan, and his testimony to this and other items is not convincing. The claims of both Seymour and Beverly Guryan for back salary and that of Seymour for the loan will be expunged.

▆ There remains the trustee's appeal upon the issue of voidable preferences. The facts as to these are as follows. Beverly Guryan received a cheque for $306 from the company on August 1, 1938, in payment of a loan of $300. She withheld this cheque until April 11, 1939, just a week before petition filed, and four days after the landlord had on April 7, 1939 begun a proceeding for summary ejectment in the state court. Her explanation is that her uncle Isidore told her "it would be better to leave the cash working for the

business instead of my taking it;" and that Isidore who left the corporation on April 8th, had also told her "previous to that that I could cash the cheque but I kept it for a while." Her attorney contradicted this, saying that the cheque was deposited at the attorney's own suggestion. We cannot accept this explanation; Beverly Guryan was an employee in the business and half owner, and her brother was its president. The long delay, coupled with presentation after collapse was imminent, were too aptly timed for any other conclusion than that she was acting to save something out of the impending shipwreck. The case against Seymour Guryan is stronger. It is true that he held back a cheque for $200 only from March 1, 1939, to April 10th; but when he cashed it, he had already been personally served with the warrant in summary ejectment. Both payments must be restored as a condition of allowing the claim for $6,000.

The claims of the foreign legatees will be expunged; the claim of Seymour and Beverly Guryan will be allowed at $6,000; their other claims will be expunged; the foreign legatees will be entitled to any dividends declared upon the $6,000 claim; the claim itself will be allowed only in case Seymour Guryan repays $200 and Beverly Guryan $306, or the foreign legatees assume that duty for them.

Order reversed.